<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                               :
CARLOS CEVALLOS-BERMEO,         :
                               :        Civil No. 04-1469 (FSH)
               Petitioner,      :
                               :
         v.                     :
                               :             OPINION
ROY L. HENDRICKS, et al.,       :
                               :
               Respondents.     :
_____:
```

**APPEARANCES:**

> CARLOS CEVALLOS-BERMEO, Petitioner <u>Pro</u> <u>Se</u>
> # 286412/132095C
> New Jersey State Prison
> P.O. Box 861
> Trenton, New Jersey 08625
>
> H. JOHN WHITMAN, ESQ.
> OFFICE OF NJ ATTORNEY GENERAL
> Appellate Bureau
> P.O. Box 086
> Trenton, New Jersey 08625
> Attorneys for Respondents

**HOCHBERG, District Judge**

This matter is before the Court on petitioner Carlos Cevallos-Bermeo's application for habeas corpus relief under 28 U.S.C. § 2254. For the reasons stated below, the petition for habeas relief will be denied for failure to make a substantial showing of a federal statutory or constitutional deprivation.

I.   <u>BACKGROUND</u>

A.   <u>Procedural History</u>

Petitioner, Carlos Cevallos-Bermeo, is presently confined at the New Jersey State Prison in Trenton, New Jersey.  He challenges an April 7, 1998 state court conviction and sentence imposed by the Superior Court of New Jersey, Law Division, Criminal Part, Hudson County.

Petitioner was convicted by jury trial for murder, felony murder, kidnaping, aggravated sexual assault, attempted aggravated sexual assault, aggravated criminal sexual contact, and weapons offenses.  He was sentenced to an aggregate term of life in prison plus 60 years, with a 60-year parole disqualifier, to run consecutive to an earlier sentence petitioner was already serving for another murder conviction.

Petitioner appealed his conviction and sentence to the New Jersey Appellate Division.  On June 30, 2000, the Appellate Division affirmed the conviction, but modified the sentence so that "all of the terms imposed for [the present] episode run concurrent."  <u>State v. Cevallos-Bermeo</u>, 333 N.J. Super. 181 (2000).  The New Jersey Supreme Court denied certification on October 31, 2000.  <u>State v. Cevallos-Bermeo</u>, 165 N.J. 607 (2000).  Thereafter, on or about December 11, 2000, petitioner filed a

state action for post-conviction relief ("PCR"),[1] which was
denied by the court on October 11, 2001.  The PCR court did not
conduct an evidentiary hearing, but did hear oral argument from
counsel.  Petitioner appealed from the denial of his PCR
petition, and the Appellate Division affirmed the PCR court in an
unpublished per curiam opinion filed on June 30, 2003.  (Ra12).[2]
The New Jersey Supreme Court denied certification on November 14,
2003.  (Ra15).

Petitioner filed this habeas petition on or about March 22,
2004.[3]  Respondents answered the petition on November 8, 2004,
and petitioner filed a reply on April 15, 2005.

B.  Factual Background

The facts of this case were recounted below and this Court,
affording the state court's factual determinations the
appropriate deference under 28 U.S.C. § 2254(e)(1), will simply
reproduce the New Jersey Appellate Division's factual recitation:

---

[1]  Petitioner's assigned counsel filed a supplemental brief
on May 26, 2001, and petitioner filed an amended PCR petition on
June 4, 2001.

[2]  "Ra" refers to the respondents' appendix submitted to the
Court with the respondents' answer to the petition.  The appendix
contains the relevant state court record and transcripts of the
trial, sentencing and PCR proceedings.

[3]  This is a second, unrelated habeas petition filed by
Cevallos-Bermeo.  In Civil Action No. 03-3537 (WGB), petitioner
sought habeas relief from a state court conviction for a murder
committed after the murder at issue in this second habeas action.
The first habeas action was dismissed on July 29, 2005.  There
are no related claims between the two petitions.

Defendant's convictions arose out of the kidnaping, rape and murder of A.T., in the early morning hours of September 13, 1994. ... On September 12, 1994, A.T. had a fight with her live-in boyfriend because of her excessive drinking. She took $350 cash from him and left with her six-year old daughter in a taxicab. She left the child at the home of a friend who was a frequent babysitter. A.T. then went to JD's Bar. Already intoxicated upon her arrival, A.T. met Alberto Ojeda at the bar. The two continued to drink and then went to the Mambo King Bar. Eventually, the Mambo King's owner called a taxicab for A.T. However, the driver refused to take her due to a previously unpaid fare. As a consequence, A.T. started to walk home. Ojeda went outside with her, but then went back inside the Mambo King.

Sometime later, Paula Martinez and Jose Reyes saw A.T. running by them on 58th Street and Palisades Avenue screaming "God help me." A.T. asked for directions and then walked towards Bergenline Avenue. Five minutes later, defendant came by and asked Reyes if he had seen a "chick" go by. Reyes said no. Defendant continued walking in the direction of Bergenline Avenue. Shortly thereafter, Martinez saw defendant dragging A.T. from the street into Modell's parking lot on 58th Street.

At around 6:00 a.m. on September 13, 1994, A.T.'s lifeless body was found lying on her back, between parked cars in Modell's parking lot. She had numerous lacerations and was bleeding from the neck. Her pants were by her feet, and her shirt pulled up around her neck. She was not wearing any undergarments. Her sneakers were under a vehicle parked next to her. Blood was spattered on the vehicles next to the body. There was a hand impression on her right thigh. Four latent hand prints were taken from the windows of the adjoining vehicles. The medical examiner concluded that A.T. died from a combination of multiple sharp and blunt-force injuries and asphyxia by compression of the neck. Her blood alcohol level was .336.

The day after the murder, defendant purchased an airline ticket to his native Ecuador. He left the following day. Four months later, he returned to the United States. In March 1995, defendant was arrested for another murder. As a result, his photograph was published. Martinez identified defendant from the photograph as the man who had dragged A.T. into Modell's parking lot. Defendant was fingerprinted. His fingerprints matched those taken from one of the cars parked next to where A.T.'s body was found.

4

> Defendant did not testify.  In his defense, he presented
> testimony from his wife regarding his return to Ecuador.  He
> also presented testimony of other witnesses regarding the
> lighting conditions in Modell's parking lot and the distance
> to Martinez's apartment.

(Appellate Division Opinion, decided June 30, 2000, at pp. 3-5,

Ra6).

## II.  CLAIMS FOR HABEAS RELIEF

Petitioner raises the following claims in his federal habeas

petition: (A) the State's failure to comply with the Vienna

Convention mandates the reversal of the conviction, or

alternatively, a new trial; (B) the trial court erred by

admitting into evidence the results of Paula Martinez's

identification of petitioner; (C) the trial court erred by

denying petitioner's motion to introduce evidence of third party

guilt; (D) the trial court erred by denying petitioner's request

for a trifurcated trial; (E) petitioner was denied effective

assistance of trial counsel; and (F) petitioner was denied

effective assistance of appellate counsel.

It appears from the state court record that all of

petitioner's claims for habeas relief were presented to the state

courts on direct and collateral review.  The State does not

contend that any of the claims raised by petitioner here are

unexhausted under 28 U.S.C. § 2254(b).

III.  STANDARDS GOVERNING PETITIONER'S § 2254 CLAIMS

The Court recognizes that a pro se pleading is held to less stringent standards than more formal pleadings drafted by attorneys.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  Thus, a pro se habeas petition should be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Duarte v. Hurley, 43 F. Supp.2d 504, 507 (D.N.J. 1999).  Because petitioner is a pro se litigant, the Court will accord his petition the liberal construction intended for pro se petitioners.

Under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts.  See 28 U.S.C. § 2254(e); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122 S.Ct. 269 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).  Section 2254(d) sets the standard for granting or denying a habeas writ:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an

6

> unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained that subsection (d)(1) involves two clauses or conditions, one of which must be satisfied before a writ may issue. The first clause, or condition, is referred to as the "contrary to" clause. The second condition is the "unreasonable application" clause. Williams, 529 U.S. at 412-13. In the "contrary to" clause, "a federal court may grant the writ if the state arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. Under the "unreasonable application" clause, a federal court may grant the writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case." Id. at 413. Habeas relief may not be granted under the "unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief. Id. at 411. See also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied,

7

532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171
F.3d 877, 891 (3d Cir. 1999), cert. denied sub nom Matteo v.
Brennan, 528 U.S. 824 (1999).

Consonant with Williams, the Third Circuit has held that §
2254(d)(1) requires a federal habeas court to make a two-step
inquiry of the petitioner's claims.  First, the court must
examine the claims under the "contrary to" provision, identify
the applicable Supreme Court precedent and determine whether it
resolves petitioner's claims.  See Werts, 228 F.3d at 196-97;
Matteo, 171 F.3d at 888-891.  If the federal court determines
that the state court's decision was not "contrary to" applicable
Supreme Court precedent, then the court takes the second step of
the analysis under § 2254(d)(1), which is whether the state court
unreasonably applied the Supreme Court precedent in reaching its
decision.  Werts, 228 F.3d at 197.

This second step requires more than a disagreement with the
state court's ruling because the Supreme Court would have reached
a different result.  Id.  AEDPA prohibits such de novo review.
Rather, the federal habeas court must determine whether the state
court's application of the Supreme Court precedent was
objectively unreasonable.  Id.  In short, the federal court must
decide whether the state court's application of federal law, when
evaluated objectively and on the merits, resulted in an outcome
that cannot reasonably be justified under existing Supreme Court

precedent.  Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court."  Id.; see also 28 U.S.C. § 2254(e)(1).  The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence.  See Duncan, 256 F.3d at 196 (*citing* 28 U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

IV.  ANALYSIS OF PETITIONER'S CLAIMS

Having set forth the analytical framework for a habeas review under § 2254(d)(1), the Court will now address the claims presented by petitioner in his petition for habeas relief.

A.  Failure to Comply with the Vienna Convention

Petitioner first asserts a claim that was raised and rejected on direct appeal in state court.  He asserts that the State of New Jersey failed to comply with the Vienna Convention. Upon his arrest in Miami, petitioner had told the Miami police that he is an Ecuadorian citizen.  This allegedly triggered his rights under the Vienna Convention, but petitioner was never notified of these rights, which requires the authorities to

inform a foreign national of his right to contact his country's consul.  Petitioner raised this claim after his trial concluded on the guilt phase, via a motion to vacate his convictions and dismiss the death penalty specification.

The State did not contest the applicability of the Convention or deny that petitioner was not informed of his rights under the Convention.  However, the State had argued that the rights conveyed under the Convention can be enforced only by the offended country and not the individual.  Petitioner contends that the Republic of Ecuador had joined in the motion.[4]  The trial court found that there was no compliance with the Vienna Convention, but the rights conferred upon Ecuador through the Convention were "not justiciable" by petitioner as an individual. The court further noted that petitioner suffered no actual prejudice from the violation of the Convention, and denied the motion.  (Ra 90, 17:12-19:17).

On appeal, the Appellate Division acknowledged that courts are divided on the issue of whether the Convention confers individual rights.  Nevertheless, "all courts confronting the

---

[4]  The Consul General for the Republic of Ecuador joined in petitioner's motion claiming a violation of Article 36 under the Vienna Convention.  Counsel for the Republic of Ecuador argued that it was the position of that country that the petitioner should be remedied.  (Ra 89, 31:15-17).  Specifically, the Republic of Ecuador submitted that the appropriate remedy in this instance would be to dismiss the death penalty certification based on the Republic's historic opposition to capital punishment.  (Ra 89, 34:3-8).

issue have required that a defendant show actual prejudice as a prerequisite for relief." (Ra6, at pg. 6). See United States v. Tapia-Mendoza, 41 F. Supp2d 1250, 1253 (D. Utah 1999)(imposing a "requirement that actual prejudice resulting from the alleged violation must be shown before obtaining a remedy"). The appellate court also noted the Supreme Court's decision in Breard v. Greene, 523 U.S. 371 (1998). In Breard, the Court observed that even if a Convention claim were properly raised and proven by a defendant, "it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." 523 U.S. at 377. Accordingly, the Appellate Division declined to rule on the issue of standing and proceeded to analyze whether petitioner had established prejudice from the State's failure to comply with the Convention. (Ra6, at pp. 6-8).

The appellate court followed the three part test concerning the sufficiency of a showing of prejudice, as established by the Ninth Circuit in United States v. Villa-Fabela, 882 F.2d 434 (9th Cir. 1989), overruled on other grounds, United States v. Pro-Tovar, 975 F.2d 592 (9th Cir. 1992). Under this test, petitioner must prove that (1) he did not know his right; (2) he would have availed himself of this right had he known of it; and (3) there was a likelihood that contact with the consul would have resulted

11

in assistance to him.  <u>Villa-Fabela</u>, 882 F.2d at 440.  (Ra6, at

pp. 8-9).  Applying this standard, the Appellate Division found:

> Here, defendant has satisfied the first prong of this test:
> he did not know of his right to contact the consulate.  The
> only evidence that he would have contacted the consulate,
> had he known of his right, is his own statement that he
> would have done so.  Even assuming that the first two prongs
> are satisfied, defendant must satisfy prong three.
> Defendant asserts general claims of prejudice ("the consular
> officer can identify potential problems and obstacles the
> national may face in an unfamiliar and strange legal
> system," bridge "cultural gaps" and "facilitate an active
> defense").  He also claims that the consul
>
> > Would likely have communicated directly with the
> > Hudson County Prosecutor's Office immediately to
> > ascertain the status of defendant's case and the
> > options that the Prosecutor was considering.  The
> > consul could have opened a dialogue with that Office,
> > which would have resulted in the consul presenting
> > whatever facts and legal argument it could muster on
> > defendant's behalf.
>
> These claimed prejudices are vague and general, and could
> apply to any foreign national who was not advised of his
> right to contact the consul.  Moreover, contrary to
> defendant's insinuation, the consul cannot render legal
> advice. [<u>United States v. Alvarado-Torres</u>, 45 F. Supp.2d
> 986, 992 (S.D. Cal. 1999), <u>aff'd</u>, 230 F.3d 1368 (9th Cir.
> 2000)].  Accordingly, we conclude that defendant has failed
> to establish any remediable prejudice due to the State's
> failure to comply with the Convention.

(Ra6, at pg. 9).

This Court finds that the state courts appropriately applied

established federal law in reviewing petitioner's violation of

the Vienna Convention claim.  The United States is a signatory to

the Vienna Convention on Consular Relations ("Vienna

Convention"), April 24, 1963, 21 U.S.T. 77, 101 T.I.A.S. No.

6820, 596 U.N.T.S. 261, 1967 WL 18349, which came into force on

April 24, 1964, and which was ratified by the United States on

October 22, 1969.  See Cong. Rec. 30997 (1969).  The Preamble

states that "the purpose of such privileges and immunities [set

forth herein] is not to benefit individuals, but to ensure the

efficient performance of functions by consular posts on behalf of

their respective States."

However, Article 36 of the Vienna Convention provides, in

pertinent part:

> 1.  With a view to facilitating the exercise of
> consular functions relating to nationals of the sending
> State: ...
> (b) if [a detained person] so requests, the competent
> authorities of the receiving State shall, without
> delay, inform the consular post of the sending State
> if, within its consular district, a national of that
> State is arrested or committed to prison or to custody
> pending trial or is detained in any other manner.  Any
> communication addressed to the consular post by the
> person arrested, in prison, custody or detention shall
> also be forwarded by the said authorities without
> delay.  The said authorities shall inform the person
> concerned without delay of his rights under this
> subparagraph;
> (c) consular officers shall have the right to visit a
> national of the sending State who is in prison, custody
> or detention, to converse and correspond with him and
> to arrange for his legal representation.  ...
> 2.  The rights referred to in paragraph 1 of this
> Article shall be exercised in conformity with the laws
> and regulations of the receiving State, subject to the
> proviso, however, that the said laws and regulations
> must enable full effect to be given to the purposes for
> which the rights accorded under this Article are
> intended.

Vienna Convention, Article 36.[5]

_____

    [5]  The provisions of Article 36 have been implemented in
federal regulations, including 28 C.F.R. § 50.5(a)(1) ("In every

Article 36 has been the subject of litigation in a variety of contexts in both United States and international courts, and it appears that the courts are divided on the issue of whether the Convention confers individual rights.  However, in Breard, the Supreme Court noted that Article 36 "arguably confers on an individual the right to consular assistance following arrest," but that, even were Breard's claim properly raised and proved, "it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial."  Id. at 377 (citation omitted).  The Court observed that Breard's trial attorneys "were likely far better able to explain the United States legal system to him than any consular official would have been."  Id.  The Court considered his claim of prejudice, that had the Vienna Convention been followed he would have pursued a plea offer that would have spared him the death penalty, "far more speculative than the claims of prejudice courts routinely

_____

case in which a foreign national is arrested the arresting officer shall inform the foreign national that his consul will be advised of his arrest unless he does not wish such notification to be given.").  See also 28 C.F.R. § 50(a)(2) (requiring the arresting agent to inform the U.S. Attorney of the arrest and of the arrestee's wishes regarding consular notification); 28 C.F.R. § 50.5(a)(3) (directing the U.S. Attorney to notify the appropriate consul in accordance with the arrestee's wishes); 8 C.F.R. § 236.1(e) (requiring the INS to notify every detained alien of the right to communicate with consul).

reject in those cases [where] an inmate alleges that his plea of guilty was infected by attorney error." Id. (citation omitted).

More recently, the Seventh Circuit held that the subject provision under the Vienna Convention conferred individually enforceable rights upon a citizen of another country. Jogi v. Voges, 425 F.3d 367 (7th Cir. 2005). In Jogi, a national from India brought a civil action against county law enforcement officials under the Alien Tort Statute for failing to inform plaintiff of his right to consular notification upon his arrest as provided under Article 36 of the Vienna Convention. The Seventh Circuit found that it had subject matter jurisdiction to adjudicate the matter under the Alien Tort Statute; that Article 36 conferred individually enforceable rights upon the plaintiff; and that plaintiff's conviction or sentence did not have to be invalidated in order for him to seek a monetary award.

Nevertheless, the Court of Appeals did note that most courts to date have refrained from deciding whether an individual right exists under the Vienna Convention in the context of criminal or habeas proceedings, but instead have concluded that the various remedies available to a criminal defendant, such as the quashing of the indictment or suppression of evidence, are not the proper remedies for a consular notification violation. Id., 425 F.3d at 279. The Seventh Circuit set forth citations of applicable decisions.

15

United States v. Li, [206 F.3d 56, 60 (1st Cir.), cert. denied, 531 U.S. 956 (2000)], ("We hold that irrespective of whether or not the treaties create individual rights to consular notification, the appropriate remedies do not include suppression of evidence or dismissal of the indictment."); United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001)("Even if we assume arguendo that De La Pava had judicially enforceable rights under the Vienna Convention -- a position we do not adopt -- the Government's failure to comply with the consular notification provision is not grounds for dismissal of the indictment."); Murphy v. Netherland, 116 F.3d 97, 100 (4th Cir. 1997)(finding that "even if the Vienna Convention on Consular Relations could be said to create individual rights" the defendant could not obtain habeas relief because his claim was procedurally defaulted); United States v. Page, 232 F.3d 536, 541 (6th Cir. 2000)(concluding that "although some judicial remedies may exist, there is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of Article 36")[cert. denied, 532 U.S. 935 (2001)]; United States v. Chaparro-Alcantara, 226 F.3d 616, 621 (7th Cir. 2000)("It is sufficient for present purposes to assume that such an individual right is created by the Convention and to confront squarely whether the exclusionary rule is the appropriate sanction for a violation of that right.")[cert. denied, 531 U.S. 1026 (2000)]; United States v. Lawal, 231 F.3d 1045, 1048 (7th Cir. 2000)(same)[cert. denied, 531 U.S. 1182 (2001)]; United States v. Ortiz, 315 F.3d 873, 886 (8th Cir. 2002)("Even if we assume for present purposes that the Convention creates an individually enforceable right, it would not follow, on this record, that the statements should be excluded merely because the Convention has been violated.")[cert. denied, 540 U.S. 1043 (2003)]; United States v. Lombera-Camorlinga, 206 F.3d 882, 885 (9th Cir. 2000)(en banc)(declining to decide whether Article 36 creates an individually enforceable right but concluding that suppression of evidence is an inappropriate remedy)[cert. denied, 531 U.S. 991 (2000)]; United States v. Minjares-Alvarez, 264 F.3d 980, 986-87 (10th Cir. 2001)(declining to decide whether the Vienna Convention creates individually enforceable rights, but concluding that suppression is not an appropriate remedy); United States v. Duarte-Acero, 296 F.3d 1277, 1282 (11th Cir. 2002)(holding that a violation of the Vienna Convention does not warrant the dismissal of an indictment)[cert. denied, 537 U.S. 1038 (2002)]; United States v. Cordoba-Mosquera, 212 F.3d 1194, 1196 (11th Cir. 2000)(per curiam)(same)[cert. denied, 531 U.S. 1131 (2001)].  Two circuit courts have found, in the

context of a criminal proceeding, that the treaty does not confer individual rights. <u>United States v. Emuegbunam</u>, 268 F.3d 377, 394 (6th Cir. 2001)[<u>cert</u>. <u>denied</u>, 535 U.S. 977 (2002)]; <u>United States v. Jimenez-Nava</u>, 243 F.3d 192, 198 (5th Cir. 2001)[<u>cert</u>. <u>denied</u>, 533 U.S. 962 (2001)].

<u>Jogi</u>, 425 F.3d at 379-80.  <u>See also</u> <u>United States v. Briscoe</u>, 69 F.Supp.2d. 738, 744-48 (D.V.I. 1999) (denying motion to suppress, court held that arrestee possesses individual right under Article 36, but must show prejudice to obtain remedy; in the absence of showing of prejudice, court did not consider nature of appropriate remedy), <u>aff'd</u>, 234 F.3d 1266 (3d Cir. 2000) (Table).

Since <u>Breard</u>, the International Court of Justice ("ICJ") has addressed claims against the United States involving its application of Article 36.  In <u>LaGrand (Germany v. United States of America)</u>, 2001 WL 34607609, 2001 I.C.J. 466 (2001), involving German nationals who were sentenced to death and executed during the pendency of the proceedings, the ICJ held that Article 36 creates individual rights, which may be invoked in the ICJ by the national State of the detained person.  <u>LaGrand</u>, 2001 I.C.J. 466, 494 at ¶ 77.  The ICJ further stated that if a consular notification violation occurred to the detriment of German nationals, an apology would not suffice in cases where the individuals have been subjected to prolonged detention or convicted and sentenced to severe penalties.  In such a case, the United States should allow the review and reconsideration of the conviction and sentence by taking account of the violation of the

17

rights set forth in the Convention.  "This obligation can be carried out in various ways.  The choice of means must be left to the United States."  Id. 2001 I.C.J. 466, 513-514 at ¶ 125. Although Germany had initially sought reparations for itself for the violation of its rights, it dropped that claim during the course of the proceedings and never sought reparations for the violation of the rights of its nationals.  Id. 2001 I.C.J. 466, 471-474 at ¶¶ 10, 12.

After the LaGrand decision, the United States instituted measures providing for review and reconsideration in all death penalty cases involving foreign nationals who had not received the notice required by Article 36.  See Case Concerning Avena and Other Mexican Natinals (Mexico v. United States), 2004 I.C.J. No. 128 (Judgment of Mar. 31).  Specifically, the United States permits such review and reconsideration to "occur through the process of executive clemency -- an institution 'deeply rooted in the Anglo-American system of justice' -- which may be initiated by the individuals concerned after the judicial process has been completed."  Id.

Recently, the Supreme Court held that a violation of the Vienna Convention's consular access provisions may not be cognizable in a federal habeas proceeding, unless it meets the "fundamental defect" test announced in Hill v. United States, 368 U.S. 424 (1962).  Medellin v. Dretke, __ U.S. __, 125 S.Ct. 2088,

18

2090 (2005).  A fundamental defect is an error which "inherently results in a complete miscarriage of justice."  <u>Hill</u>, 368 U.S. at 428.  Petitioner would need to show that the "omission [here was] inconsistent with the rudimentary demands of fair procedure," or that there were exceptional circumstances where the need for federal habeas relief is apparent.  <u>Id</u>.  Based on the facts in this case, as set forth below, petitioner has not demonstrated that the failure to notify him of his right to consular access under the Vienna Convention resulted in a "fundamental defect" in his case.

Indeed, assuming arguendo that petitioner has standing, he still must show that the failure to inform him of his rights under the Convention caused him actual prejudice as a prerequisite for relief.  <u>Tapia-Mendoza</u>, 41 F. Supp2d at 1253. This Court finds that petitioner has been unable to demonstrate any remediable prejudice.  Although he was initially tried under a death penalty specification, to which the Republic of Ecuador had objected at the close of the guilt phase of petitioner's trial, petitioner was not sentenced to death.  The death penalty was the significant factor in the <u>LaGrand</u> and <u>Avena</u> cases. Furthermore, the Republic of Ecuador has not maintained an action against the United States for the consular notification violation.

19

Petitioner also does not contend that he would have fared better with a plea bargain had the consul been timely notified. In fact, the trial court found, based on the State's certification, that the designation of this homicide as a capital case was an established policy and procedure intended to remove such decisions from any political influences.  (Ra 90, 14:4-10). Moreover, the court found the suggestion that the Consular General would have been instrumental in persuading a plea arrangement between the Prosecutor's Office and petitioner to be purely speculative.  (Ra 90, 17:12-17).  Indeed, in this habeas petition, petitioner contends his innocence and argues that there was evidence of third party guilt that would exculpate him. Thus, it seems highly unlikely that petitioner would have accepted a plea bargain in this case, even if a Consulate official had intervened.

Finally, as in Breard, petitioner in this case had trial attorneys who were far more capable of explaining the legal system to him than a consular officer would have been.  Breard, 523 U.S. at 377.  Petitioner received a fair trial and all constitutional safeguards were afforded him.  His attorneys filed numerous motions on petitioner's behalf and vigorously represented petitioner in all proceedings.  Consequently, petitioner has not shown that the violation of the Vienna Convention in this case had an effect on the outcome of the

20

trial; therefore, the violation should not result in the overturning of his conviction.  <u>Breard</u>, 523 U.S. at 377.

Furthermore, since the Vienna Convention claim was adjudicated on the merits by the state courts, federal habeas relief is available to petitioner only if such adjudication "was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  This Court finds that the state courts did not unreasonably apply established federal law in reaching their decisions with respect to the Vienna Convention claim.  In particular, the state courts found that petitioner failed to demonstrate that he was actually harmed by the lack of consular notification concerning his arrest.  Also, petitioner was provided with effective legal representation, and his constitutional rights were safeguarded.  Thus, petitioner has not demonstrated that the state court decisions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  <u>Matteo</u>, 171 F.3d at 891.  Accordingly, this first claim for habeas relief is denied for lack of merit.

B.  <u>Admission of Out-of-Court Identification at Trial</u>

Petitioner next argues that the trial court erred in admitting the photo identification testimony of witness Paula Martinez into evidence at trial.

An accused is entitled to due process protection against the introduction of evidence of, or tainted by, unreliable identifications elicited through an unnecessarily suggestive photographic array. United States v. Ash, 413 U.S. 300, 320 (1973); Manson v. Brathwaite, 432 U.S. 98, 110-17 (1977); Simmons v. United States, 390 U.S. 377 (1968) (due process prohibits in-court identification if pre-trial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification").

The Supreme Court has recognized that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." Simmons, 390 U.S. at 383. The Court has identified certain procedures that heighten the risk of misidentification, including such practices as displaying the photo of only a single individual who generally resembles the person the witness saw, showing the witness photos of several persons among which the photograph of a single individual recurs or is in some way emphasized, or indicating to the witness that police have other evidence that one of the persons pictured committed the crime. Id. Despite the risk of misidentification, the Supreme Court has not prohibited the employment of photographic identification methods, either in the exercise of its supervisory power or as a matter of constitutional requirement. Id. Instead, the Court has required that each case

22

must be considered on its own facts and must be evaluated in light of the totality of surrounding circumstances; also, the Court has noted that the risk of conviction based on photo misidentification "may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error."  Id.

Where there has been an unnecessarily suggestive pre-trial photographic identification of a suspect,

> reliability is the linchpin in determining the admissibility of identification testimony ... .  The factors to be considered ... include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

Manson v. Brathwaite, 432 U.S. at 114 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).  "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Simmons, 390 U.S. at 383.  See also Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other grounds, Griffith v. Kentucky, 479 U.S. 314 (1987).

23

Where a trial court has failed to exclude identification evidence obtained in violation of a defendant's due process or Sixth Amendment rights, the habeas court must determine whether the failure to exclude that evidence was harmless constitutional error under <u>Chapman v. California</u>, 386 U.S. 18 (1967).  <u>See</u> <u>Moore v. Illinois</u>, 434 U.S. 220, 232 (1977).

The Court of Appeals for the Third Circuit has explained that the

> <u>Simmons/Stovall</u> inquiry is essentially two-pronged. The first question is whether the initial identification procedure was "unnecessarily" or "impermissibly" suggestive.  This inquiry actually contains two component parts: "that concerning the suggestiveness of the identification, and that concerning <u>whether there was some good reason for the failure to resort to less suggestive procedures</u>."  If a procedure is found to have been unnecessarily suggestive, the next question is whether the procedure was so "conducive to ... mistaken identification" or gave rise to such a "substantial likelihood of ... misidentification" that admitting the identification would be a denial of due process.

<u>United States v. Stevens</u>, 935 F.2d 1380, 1389 (3d Cir. 1991) (citations omitted) (emphasis added by Third Circuit).

Here, petitioner contends that the trial court should have suppressed witness Paula Martinez's out-of-court identification because it was unreliable and impermissibly suggestive. Petitioner asserts that Ms. Martinez was a key witness for the State.  However, when she was first approached by the police she was unwilling to make an identification.  On September 22, 1994, Martinez was unable to make an identification from two photo

arrays shown to her by the police.  On October 5, 1994, she was shown more photo arrays, but could only identify hair type from two photos shown.  On March 21, 1995, Martinez was shown a different photo array.  This array contained the picture of petitioner.  Petitioner alleges that he was the only individual in the photo array with a round face.  The other photos purportedly showed men with long faces.  Several months later, Martinez saw a picture of petitioner in the newspaper, from which she identified petitioner as the person she saw the night of the murder.  The newspaper photo showed petitioner in a prison uniform with handcuffs.  Petitioner contends this identification was "terribly improper".

Petitioner also alleges that, during the <u>Wade</u>[6] hearing, Martinez refused to and could not identify petitioner as the person she saw that night.  Petitioner argues that Ms. Martinez was never sure of petitioner's identity.

Despite all of these arguments, the trial court denied defense counsel's motion to exclude Martinez's out-of-court identification, and allowed the identification to be admitted into evidence.  Respondents contend that the trial court's ruling was proper.

The trial court made the following factual findings with respect to Ms. Martinez's testimony at the <u>Wade</u> hearing.  (<u>See</u> Ra

---

[6]  <u>United States v. Wade</u>, 388 U.S. 218 (1967).

36, 3:18-14:4).  First, Ms. Martinez saw the alleged attacker for at least one to seven minutes while she was outside with Reyes. Before she went back upstairs to her apartment, Martinez noticed the same man dragging the victim by the arms and waist into the Modell parking lot.  Martinez gave a statement to the police on September 13, 1994.  She was unable to identify the attacker from a photo array on September 21, 1994.  This photo array did not contain petitioner's picture, but did have photos of a Mr. Ojeda and a Mr. Nunez, who were potential suspects for the crime. Being unable to identify the attacker from the photo array, Martinez gave a description to the police.[7]  On October 5, 1994, Martinez viewed another photo array, this time with a different person as the prime suspect.  Martinez did not recognize anyone as the attacker, but stated that two of the  photos (not the intended target's photo) looked like the assailant but with different hairstyles.  On November 16, 1994, Martinez was shown another group of photos that included many suspects, other than petitioner, and three books of photographs in general.  Again she failed to identify any photo as the attacker.

Finally, on March 21, 1995, Martinez was shown another photo array, this time with a photo of petitioner at the number 2 spot. Martinez tapped petitioner's picture, saying the man looked like

---

[7]  This description included the following characteristics: Hispanic male between 5 feet and 5 feet, 8 inches tall, stocky build, clean shaven, about 27 to 28 years old.

the man she saw that night, but the man's hair was shorter and he
had no mustache.  At that point, the police showed her
petitioner's passport photo, without identifying it.  Ms.
Martinez was still not 100% positive that the man in the photo
was the person she saw on the night of the murder.  Later, Ms.
Martinez saw petitioner's picture in the newspaper (he was in
jail garb), and "felt peace" because the man she saw on the night
of the murder was in prison.  The police did not show the
newspaper photo to Martinez.

The trial court made a ruling after the <u>Wade</u> hearing, and
made the following determinations after fully reviewing the
relevant state and federal law as established on the issue of
identification procedures:

> S-5 W is a photographic array of six Hispanic males all with
> the same facial expression,[8] all have dark hair, all have
> mustaches and various stages of growth, all have dark eyes,
> the length of hair is similar on all of them.  All people
> are approximately the same age specifically this Court finds
> mid to late twenties.  There is nothing in S-5 W about Mr.
> Cevallos' photo number 2 that stands out from the others or
> from one another.
>
> Now regarding the passport photo on March the 21, 1995, as
> previously mentioned, S-5 W was shown to Paula Martinez.  S-
> 5 W was a six photo array, the Defendant in the number 2
> slot.  Ms. Martinez was told at that time she was going to
> be shown six photos of Hispanic males would she identify any
> as the suspect.  Ms. Martinez looked at S-5 W and Ms.
> Martinez tapped her pinky on number 2, Mr. Cevallos, and
> says number 2 "looks like the suspect but she was not 100

---

[8]   This array is the one petitioner asserts was
impermissibly suggestive because all of the men in the photos had
oval faces and petitioner has a round face.

percent sure because the suspect's hair was shorter and the suspect had no facial hair."

Gonzalez from the Prosecutor's Office had Mr. Cevallos' passport and after consultation with Assistant Prosecutor Raviola, showed her S-6 A.  As Gonzalez showed Paula Martinez S-6 A, he said, "I am going to show you a passport photo.  Look at it and see if you can recognize the person." Ms. Martinez was not told that S-6 A was the Defendant's passport photo.  When shown S-6 A, Paula Martinez, according to her, was more sure but not "sure sure", not 100 percent sure.

The issue is, was the identification not actually that of Paula Martinez but was it imposed upon her by Gonzalez? Would a showing by law enforcement of a passport photo array have been more desirable?  Perhaps.  The desirability of such a procedure is not the standard.
However, the witness had stopped at number 2 of S-5 W and told law enforcement that number 2, Mr. Cevallos, looked like the suspect but the hair and facial hair is different. In an effort to define or focus this tentative identification, the police sought approval to show Paula Martinez a single photo from Homicide Division legal adviser to discuss the procedures since a tentative identification had been made.

Was the procedure suggestive?  Perhaps.  But the witness had focused on an individual and given the police a qualification, the hair and facial hair was different. Police in an effort to aid the investigation showed the witness one photo closer in detail to the description given by that witness.

The police did not tell the witness whose passport photos was being shown, although quite frankly, it is obvious. After looking at the passport photo, Paula Martinez still was not "100 percent sure."  This procedure utilized by the police fall[s] short of being impermissibly suggestive to Paula Martinez.  Although clearly, Paula Martinez knew that the passport photo was number 2 of S-5 W, there was no suggestion by law enforcement impermissibly or otherwise, that either number 2 of S-5 W or S-6 A was the suspect.

(Ra 36, 28:4-30:6).

The trial court also ruled that the newspaper photo identification made by Ms. Martinez was not improper because the photo was not shown to her law enforcement; thus, no <u>Wade</u> issue is relevant.  (Ra 36, 31:3-5).  In short, the trial court found no impermissible circumstances of suggestion, and no likelihood of an "irreparable misidentification" with respect to the photo identification of petitioner by Martinez.  <u>See</u> <u>Simmons</u>, 390 U.S. at 383-84.

On direct review, the Appellate Division found the claim raised by petitioner to be without merit, not warranting discussion.  (Ra 6, at pg. 10).

Reviewing the <u>Wade</u> hearing transcript, and the trial court's ruling, this Court finds that the police-conducted photo identifications were not unduly suggestive or conducive to misidentification.  No identifications were made during any of the other photo showings, which did not contain petitioner's photo, thus rendering Ms. Martinez's March 21, 1995 photo identification of petitioner substantially reliable.  There was no suggestiveness with respect to the photo array containing petitioner's picture, nor in any of the previous photo showings where other suspects were the intended target for identification.  Thus, misidentification of petitioner under these circumstances was not likely.

Moreover, as this Court noted above, suggestiveness alone would not require the exclusion of identification testimony.  The reliability of the identification must be based on the totality of the circumstances.  A "suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability," for reliability is the "linchpin in determining the admissibility of identification testimony."  Manson v. Brathwaite, 432 U.S. at 106.  In order to judge whether there was a substantial likelihood of misidentification, the court must look at the reliability of the identification in light of the "totality of the circumstances."  Government of Virgin Islands v. Riley, 973 F.2d 224, 228 (3d Cir. 1992).  The court should consider factors such as the witness' original opportunity to observe the suspect, the degree of attention during the initial observation, the accuracy of the initial description, the witness' degree of certainty when viewing the suspect at the confrontation, and the elapsed time between the crime and the apprehension and identification.  Neil v. Biggers, 409 U.S. at 199-200.

Applying the Biggers factors, this Court concludes that the out-of-court identification of petitioner by Martinez was reliable.  Indeed, the trial court closely followed the Biggers factors in determining that the totality of the circumstances

30

supported the reliability of Martinez's identification of petitioner.

First, the trial court found that Martinez had ample opportunity to view the suspect at the time of the crime, for a period of one to five minutes under street lights. And not just once, but twice; first during the suspect's conversation with Mr. Reyes, and second, when Martinez saw the suspect dragging the victim into a parking lot under street lights. The court also found that Martinez's degree of attention to the suspect at the time was adequate to produce a reliable identification. (Ra 36, 32:23-33:24).

Next, the trial court found that the description she gave of the suspect on many different occasions over a period of time were precise and accurate. Martinez's description substantially matched the witness, Mr. Reyes', description, also bolstering the reliability of her identification. Ms. Martinez had a reasonable level of certainty, although not 100 percent certainty, about her identification. (Ra 36, 33:25-38:2). Finally, the distance in time from the identification and the night of the murder was not so great as to render the photo identification unreliable when considering the totality of the circumstances.[9]

---

[9]   Martinez was unable to identify anyone from photo arrays several days after the murder. She gave a full description to the police of the person she saw that night eight days after the murder. Her initial identification of petitioner from a photo array (the first photo array that contained his picture) was six

Therefore, in light of all these factors, this Court finds that the Martinez identification of petitioner was not so inherently unfair or impermissibly suggestive as to create a substantial likelihood of irreparable misidentification.  There were sufficient aspects of reliability to ensure that the petitioner was correctly identified.  Moreover, this Court finds that the state court adjudication of this claim did not result in a decision that (1) was contrary to clearly established federal law, (2) involved an unreasonable application of clearly established federal law, or (3) was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  The state court correctly identified and applied the governing legal rule and reasonably determined the applicable facts.  Accordingly, this claim for habeas relief will be denied for lack of merit.

C.  Refusal to Admit Evidence of Third Party Guilt

Petitioner alleges that the trial court erred in refusing to admit evidence of third party guilt.  He claims there was evidence of at least one identified individual and possibly others.  Respondents contend that the trial court did admit some, but not all, evidence of third party guilt.  For instance, the court allowed evidence concerning Alberto Ojeda, the victim's drinking partner on the night of the crime.  However, the trial court found the other evidence proffered by petitioner on the

---

months after the murder.

issue of third party guilt to be speculative and as having no rational tendency to connect these other persons to the crime or to engender reasonable doubt about the State's case.[10]

The trial court conducted a hearing on the issue of admitting evidence of third party guilt.  The defense proffered a number of individuals on the issue of third party guilt.  The trial judge recited the litany of proffered suspects and the testimony given about these individuals.  (Ra 55, 2:7-10:21).  The court noted that the witness, Paula Martinez, was shown photo arrays that included all of the named suspects, in particular, Nunez, Avila, Ojeda, Quinones, Randle, Tarasoff, and Sepulveda, with negative results.  Moreover, none of these individuals had been linked forensically to the scene of the crime.  (Ra 55, 10:22-25).

---

[10]   This evidence included a phone call received by Veronica Chalco two weeks after the murder, which had no tendency to prove that someone other than the petitioner committed the murder. Evidence that the victim's husband beat her several years earlier had no relevancy when there was no evidence that the husband was in the area on the night of the crime, and that he did not fit the description of the person seen by witnesses Martinez and Jose Reyes.  Finally, as to Jose Nunez and Luis Avila, the court found no evidence to link them to the murder.  Nunez was much taller than the man described by Martinez and Reyes, and his familiarity with the victim's temper and details of the crime weeks afterward was not sufficient to link him to the crime.  Nunez also was not in the bars visited by the victim on the night of the murder.  As to Avila, the victim had accused him of attempted rape three months before her murder but there was no evidence tying Avila to the murder.  The mere fact that Avila had a utility knife in his apartment had little probative value since any number of sharp instruments could have caused the victim's injuries.

The court reviewed extensively the relevant state law on the issue of admitting evidence of third party guilt.  The court observed that:

> Evidence which can have no other effect than to cast a bare suspicion on another or to raise a conjectural inference as to the commission of the crime by another is not admissible.  There must be some thread capable of inducing reasonable men to regard the event as bearing upon the state's case.  [State v. Sturdivant, 31 N.J. 165, 179 (1959), cert. denied, 362 U.S. 956 (1960)].
>
> (Ra 55, 11:22-12:2).  . . .
>
> Trial courts must generally make a relevancy determination weighing the probative value of the proffered testimony against such countervailing considerations as the capacity of the evidence to mislead or confuse the jury and undue consumption of time to name just a few.

(Ra 55, 14:5-9).  The court also carefully reviewed numerous cases that dealt with the same issues raised by petitioner's proffer of third party guilt.  (Ra 55, 11:5-32:23).  Then, the court made the following ruling, excluding most of the proffered evidence:

> Starting first with the bald-headed gentleman in the instant case that was allegedly one week before the incident chasing the victim down the street, this Court holds that in the instant case, there is not a sufficient link between the individual and the victim.  There is no proximity to time and place that satisfies the relevance standard of Sturdivant.  This so-called hostile event in its connection to this case [is] mere conjecture.  This evidence has very little probative value which is outweighed by considerations of confusing the jury and undue waste of time.
>
> ...
>
> The victim's family's speculation about the victim overhearing a drug deal at JD's is, in fact, speculation and unreliable evidence that has very little probative value and

34

will have the capacity to mislead and confuse this jury.
This Court believes that the speculative nature of that
evidence, the unreliable nature of that evidence clearly
outweighs the very small probative value that that evidence
has, and that evidence will not be heard.

Veronica Chalco, the individual who received the telephone
call a week or approximately two weeks, actually, after the
event, this hostile event, meaning the telephone call and
its connection to this case, is mere conjecture.  Its
probative value is outweighed by its confusing and
misleading the jury. ...  The conversation that Ms. Chalco
had a couple of weeks after this incident has no thread to
the victim and the crime.  It does not meet the relevance
standards as set forth in <u>Sturdivant</u>.

Hernan Sepulveda.  What proof is there in this evidence that
has a rational tendency to engender a reasonable doubt with
respect to an essential feature of the state's case?  The
probative value of the relationship between Mr. Sepulveda
and the victim in this Court's opinion is outweighed by an
analysis of why Mr. Sepulveda and the victim were married,[11]
specifically, there was a hostile event, borrowing money,
and Mr. Sepulveda being annoyed.   But its connection to
casting a reasonable doubt on the defendant's guilt is left
to mere conjecture.  The probative value of the relationship
between Mr. Sepulveda and the victim is outweighed by a
confusing, misleading, and, quite frankly, a waste of time
of the analysis of why Mr. Sepulveda and the victim were
married.

Mr. Nunez.  The hostile events involving Mr. Nunez, arrested
in 1993 for possession of a knife while following a young
woman and a September 1994 arrest for possession of a knife
do not have sufficient enough connection other than it to be
mere conjecture.  The probative value of, one, on ...
October the 3rd, 1994, he was drunk with mood swings, he
said he frequented JD's and wanted to help the police,
thirdly, ... wanted to help the police if they would help
him with his gun charge, knowledge that the victim had a bad
temper and would see the victim in bars, and that the victim

---

[11]   It was alleged that the victim and Sepulveda were
married at the same time that she was married to Tarasoff.  The
marriage was purportedly arranged for Sepulveda's citizenship,
but he claimed that he loved her.  (Ra 55, 3:13-21).

was nasty to men, is slight and it is outweighed by a confusion of the issues in this case.

The fact that Mr. Nunez has details of the crime on or about October the 3rd, 1994, is of little probative value, since that is some three weeks after the incident and is outweighed by a confusion of issues as who knew what details of the crime when, and what time was the body shielded from public view?

Although Mr. Nunez had similar facial features, he was 6-feet-3 or 6-feet-4 inches, instead of 5-feet-8 or 5-feet-10, as described by Ms. Martinez and Mr. Reyes, this evidence does not tend to prove that a person other than the defendant committed the crime charged and does not have a rational tendency to the state's case as to its proof against this defendant.

Mr. Avila.  There is a hostile event in ... June of 1994, an attempted rape and assault to the victim, and threats to the victim's family for which complaints -- at least one complaint was filed.  And one can argue motive to kill the victim because of older charges, but what other proofs connect Avila to this offense charged?  The proffered testimony simply raises a possible ground of suspicion without providing any direct connection with the murder of Andrea Tarasoff on or about September 13, 1994, in the early morning hours.  The fact that a utility knife was found in Mr. Avila's apartment has little probative value, since the victim was slashed with a sharp-force instrument.  That covers a multitude of knives.

John Tarasoff.  The allegations of assault by ... John Tarasoff against the victim date back, according to testimony heard by this Court, before 1991, according to Fulvio Alfonso.  The final restraining order obtained by the victim was March 19, 1992, some two-and-a-half years before the murder.

According to Irma Contreras, the victim was assaulted by John Tarasoff in 1991 and 1992.  According to Robert Randle, he would see marks on the victim's body in 1990 and 1991, and the victim told him that John Tarasoff beat her in 1991.

According to Mr. Randle, the victim came to live with him in approximately 1990 because she was afraid at that time of John Tarasoff.  Mr. Randle, himself, threatened -- was threatened by Mr. Tarasoff in 1991 and 1992.  This Court

believes that those events are too remote in time to be probative. . . .

. . .

According to Amparo Lugardo, there was a physical fight between the victim and an 18-year-old two weeks before the murder because the 18-year-old was John Tarasoff's new girlfriend.  This casts suspicion on another through motive with no thread of connection to this crime.

The evidence must have a rational tendency to cast doubt on the state's proof that on September the 13th, 1994, in the early morning hours, Carlos Cevallos murdered Andrea Tarasoff.  There is not a sufficient thread between those events and that crime.

On September the 12th, 1994, at approximately 6:30 p.m., Tarasoff had a conversation with his daughter who told him she loved him and would be calling someone else Daddy.  Mr. Tarasoff believes the victim told the ... daughter to say this to him.  Again, there is no thread between this hostile event and the crime.  The probative value is outweighed by a confusion of issues. . . .

. . .

The fact that Tarasoff was interested in the status of the investigation, saying only a sick person would do this to the victim, has little relevance to who committed the crime and is not capable of raising a reasonable doubt of defendant's guilt.  The fact that Ms. Tarasoff's ex-husband was interested in the status of the investigation, including hand prints, has no relevance in this Court's opinion as to who committed the crime on September the 13th, 1994, and does not have a rational tendency to cast a reasonable doubt on the state's case against Carlos Cevallos.

What does have a thread in time and place under Sturdivant are Mr. Ojeda's activities on the late evening of September the 12th into September 13th, and quite frankly, Robert Randle, and only for the proposition of how the victim began her evening.  Robert Randle testified that on September the 12th, 1994, there was a hostile event.  She stole Mr. Randle's pay after demanding money from him, and, according to Mr. Randle, assaulted him.

> This evidence fits the time and place of relevance.  There
> is a hostile event, and this jury can make a credibility
> determination based on descriptions as to Mr. Randle's
> color, height, and any physical infirmities he might have.
> But it's relevant I believe for this jury to hear only, only
> about the hostile event between the victim and Randle and
> her stealing the money from him on the evening of September
> the 12th, 1994, and they will not hear the testimony about
> Randle and why the victim came to live with him and the
> alleged physical abuse by John Tarasoff.  So all of Mr.
> Ojeda's activities on that evening, as well as Mr. Randle's
> confrontation or the victim's confrontation with Randle are
> admissible.

(RA 55, 32:24-39:14).

This issue of third party guilt was raised on direct review,
and the Appellate Division rejected the contention as meritless
without discussion.  (Ra 6).

Generally, matters of state law and rules of procedure and
evidence are not reviewable in a federal habeas petition.  The
Supreme Court has stated that "it is not the province of a
federal habeas court to reexamine state-court determinations on
state-law questions."  Estelle v. McGuire, 502 U.S. 62, 67-68
(1991).

Federal courts must afford the states deference in its
determinations regarding evidence and procedure.  See Crane v.
Kentucky, 476 U.S. 683, 690 (1986)("we have never questioned the
power of the States to exclude evidence through the application
of evidentiary rules that themselves serve the interests of
fairness and reliability, even if the defendant would prefer to
see that evidence admitted").  It is well-established that "a

state court's misapplication of its own law does not generally raise a constitutional claim.  The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997)(citations omitted), cert. denied, 522 U.S. 1109 (1998).

However, evidentiary rulings may violate due process when the petitioner "was denied fundamental fairness at trial." Hutchins v. Hundley, 1991 WL 167036 at *4 (D.N.J. Aug. 22, 1991)(Wolin, J.)(citations omitted); see also Kontakis v. Beyer, 19 F.3d 110, 120 (3d Cir. 1994), cert. denied, 513 U.S. 881 (1994); Lisenba v. California, 314 U.S. 219, 228, 236 (1941)(holding that state court's evidentiary rulings may form the basis for habeas relief when they "so infused the trial with unfairness as to deny due process of law").  See also United States v. Agurs, 427 U.S. 97, 108 (1976)(For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial).

The appropriate inquiry is "whether the claimed error of law is a fundamental defect which inherently results in a complete miscarriage of justice or in an omission inconsistent with the rudimentary demands of fair procedure." Hutchins, 1991 WL 167036 at *4 (citing United States v. De Luca, 889 F.2d 503, 506 (3d

Cir. 1989), <u>cert.</u> <u>denied</u>, 496 U.S. 939 (1990))(other citations omitted).  The Supreme Court has further stated that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say on the whole record that the constitutional error was harmless beyond a reasonable doubt." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 681 (1986).  An error is not harmless if "it aborts the basic trial process or denies it altogether."  <u>Hutchins</u>, 1991 WL 167036 at *5 (citing <u>Rose v. Clark</u>, 478 U.S. 570, 578 n.6 (1986)).

In this case, the Court finds that the state court's evidentiary ruling with respect to the exclusion of third party guilt evidence did not violate petitioner's right to due process. There was no relation in time and place between the alleged third party suspects and the victim and the crime.  None of the alleged individuals fit the description of the person seen by Martinez and Reyes before the murder took place.  Moreover, there was no forensic evidence to link these individuals to the crime, unlike the fingerprint evidence linking petitioner to the scene.  Under state court rules of evidence, the evidence of third party guilt was properly excluded as being speculative, conjectural, and misleading and confusing to the jury, outweighing the very slim probative value, if any, of the evidence proffered.  The evidence did not have a rational tendency to prove that another person committed the murder other than the defendant, or to disprove the

state's case against petitioner.  A careful review of the
testimony and the trial court's thorough ruling show that the
trial court committed no errors of a constitutional dimension.
Also, a review of the whole record demonstrates that the trial
process was fundamentally fair.  Accordingly, this ground for a
writ of habeas corpus will be denied.

D.  <u>Denial of Trifurcated Trial Not in Error</u>

Petitioner next argues that the trial court erred in denying his motion for a trifurcated trial.  Specifically, petitioner had sought to have three separate proceedings, one to determine his guilt, the second to determine his sanity, and the third, the appropriate penalty if convicted.  Petitioner sought the trifurcated trial because his mental health defense would require his expert to speak of his prior conviction for murder, a circumstance prohibited by state caselaw.

The trial court denied the motion, finding that state law did not prohibit evidence of petitioner's prior murder conviction if that fact was relevant under <u>N.J.R.E.</u> 404(b), especially where the defense wished to present the evidence relevant to petitioner's mental condition.  (Ra 17, 6:4-11).  The court also rejected petitioner's claim that fairness required that the alternative defenses be tried to separate juries.  (Ra 17, 7:6-11).  The court found that denying a two-guilt phase trial would not deprive petitioner of a fair trial; rather, it merely required him to make hard choices about his defense.  (Ra 17, 9:16-21).

The respondent contends that the federal constitution does not mandate a bifurcated trial on the issue of sanity and guilt or innocence.  States are free to determine whether how these

matters should be tried.  <u>Vardas v. Estelle</u>, 715 F.2d 206, 212-13 (5th Cir. 1983), <u>cert</u>. <u>denied</u>, 465 U.S. 1104 (1984).

As stated previously, matters of state law and rules of procedure and evidence are not reviewable in a federal habeas petition.  <u>Estelle v. McGuire</u>, 502 U.S. at 67-68.  Federal courts must afford the states deference in its determinations regarding evidence and procedure.  Indeed, "federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." <u>Smith v. Horn</u>, 120 F.3d at 414.

Here, it may be construed that petitioner is asserting that the trial court's denial of a trifurcated trial violated due process.  Thus, the appropriate inquiry is "whether the claimed error of law is a fundamental defect which inherently results in a complete miscarriage of justice or in an omission inconsistent with the rudimentary demands of fair procedure." <u>Hutchins</u>, 1991 WL 167036 at *4.  "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say on the whole record that the constitutional error was harmless beyond a reasonable doubt." <u>Delaware v. Van Arsdall</u>, 475 U.S. at 681.

In this case, a careful review of the entire pre-trial and trial proceedings reveals that petitioner received a fair trial. Petitioner fails to demonstrate that the state court's denial of his motion for a trifurcated trial was an error of a

43

constitutional dimension.  Further, there is no showing that the state court determination in denying the motion "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  <u>Williams</u>, 529 U.S. at 412-13.  Rather, the state court's decision was based on state law and procedure.  Therefore, this Court finds no error of constitutional magnitude in the trial court's denial of a procedural mechanism of a trifurcated trial.  Moreover, the claimed "error" plainly did not constitute a fundamental defect that resulted in a complete miscarriage of justice.  Accordingly, this claim will be denied for failure to show deprivation of a federal constitutional right.

E.   <u>Ineffective Assistance of Trial Counsel</u>

Petitioner next contends that trial counsel was constitutionally deficient in the following manner: (1) failing to obtain a fingerprint expert to rebut the State's expert; and (2) failing to investigate the immigration status of identification witness, Martinez, to show possible motive of State and subsequent bias of the witness.

44

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  Id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102(3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Id.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

> defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S. 1020 (1996).

If able to demonstrate deficient performance by counsel, petitioner must next show that counsel's substandard performance actually prejudiced his defense.  Strickland, 466 U.S. at 687.  Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence.  Id. at 695-96.  Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim.  Id. at 697.  See also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

1.  *Failure to Obtain Fingerprint Expert*

Petitioner asserts that his counsel's performance at trial was deficient because counsel chose not to retain a fingerprint expert to testify at trial.  Instead, counsel relied solely upon his cross-examination of the State's fingerprint experts to

disprove the reliability or credibility of the forensic evidence to the jury.

Petitioner raised this claim in his state PCR proceeding. The PCR court found:

> In re-reading all of these transcripts, I was struck by what a good job Mr. Jacobs did in using the State's own witnesses against it. When I got all done reading that, I said to myself what could an expert for the defense have said other than, perhaps, and it is said in the brief, be cumulative, to say, yes, our expert agrees with what they conceded on cross-examination.
>
> I think the decision to do it through the State's witnesses rather than hiring their own expert was insightful. I think that can be very powerful, and that is a suggestion made in the brief. Here is my witness, they're testifying and, look, every point that they wanted to make regarding the fingerprint evidence was made through the three witnesses that the State called. There was really no need for another expert.

(Ra 111, PCR transcript, 9:11-10:1).

After citing the ineffectiveness of counsel standard as set forth in Strickland, State v. Fritz, 105 N.J. 42 (1987), and State v. Preciose, 129 N.J. 451 (1992), the Appellate Division concurred with the analysis of the PCR court, and affirmed the denial of the PCR petition on this meritless issue without further discussion. (Ra 12, at pp. 5-6).

As stated in this Opinion, supra, at pages 6-9, an independent determination of whether petitioner has satisfied the two prongs of the Strickland test is not necessary. See 28 U.S.C. § 2254(d)(1). All that is required is an "examin[ation of] the state court's decision to determine if it was 'contrary

47

to, or involved an unreasonable application of clearly established federal law.'" Hollman v. Wilson, 158 F.3d 177, 179 (3d cir. 1998), cert. denied, 525 U.S. 1143 (1999); Bey v. Morton, 124 F.3d 524, 528 (3d Cir. 1997), cert. denied, 522 U.S. 1081 (1998).   After reviewing the decisions of the state PCR and appellate courts with respect to this issue, it is clear that their decisions concerning this ineffective assistance of counsel claim met the standard under § 2254(d)(1).  The state court's conclusion that petitioner's counsel was not ineffective was a reasonable application of established federal law in the issue. In denying petitioner's PCR petition, the state PCR court specifically held that nothing in the record suggested that the trial attorney's performance was deficient nor that there was a reasonable probability that the result of the trial would have been different had a fingerprint expert been called.  In fact, the court noted that the trial attorney's cross-examination of the State witnesses on the fingerprint evidence yielded concessions that would have made the testimony of a defense fingerprint expert cumulative.

Additionally, the PCR court was impressed with trial counsel's cross-examination and found the strategy to undermine the forensic experts' testimony to be "insightful".  Trial counsel's strategic decision not to pursue cumulative testimony by a defense fingerprint expert was reasonable and was based on

an informed decision by counsel, which should be accorded a strong level of deference.  Strickland, 466 U.S. at 689, 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

Further, petitioner offers no reason in his petition to doubt the state court's analysis of federal law, which discussed the Strickland two-part test, in reaching their respective decisions.  It is the petitioner's obligation to present this Court with substantial evidence suggesting that the state courts were unreasonable in their application of the Strickland standard.  Petitioner has failed to do so.  Accordingly, this ground for relief will be denied.

2.  *Failure to Investigate Possible Bias of Martinez*

Next, petitioner alleges that his trial counsel was ineffective for not pursuing information about witness Paula Martinez's immigration status that could have been used on cross-examination to impeach her testimony as biased.  Petitioner argues that the State was instrumental in securing Martinez permission to stay in the United States, therefore, her motive for testifying against petitioner at trial was truly biased.

This issue was raised in the PCR proceeding.  Petitioner had argued that counsel should have filed a motion for a new trial based on information told to petitioner that Paula Martinez, who

49

was an illegal alien, had received working papers enabling her to stay in the United States.  The PCR court stated that it would have to analyze the statement by petitioner, whether it was transmitted to trial counsel, whether the statement would have been admissible, and whether it would have changed the outcome of the trial.  (Ra 111, 21:3-11).  Specifically, the PCR court found:

> First, the Court would note that the cross-examination of any potential bias of Paula Martinez was thoroughly undertaken.  Particular transcript references of page 58 start with discussions about political asylum applications. They continue through the issue of deportation proceedings and the assistance of the Prosecutor's Office with respect to deportation proceedings through pages 64 of the transcript of October 15, 1997.  Particularly, there is colloquy on page 67 line 18 through 68 line 7 which clearly the issues with regard to her potential bias in favor of the State were adequately and thoroughly examined and clearly and squarely before the jury.

> The new information to support a basis for a new trial was purportedly something told to the defendant which would in and of itself constitute hearsay.  Hearsay in the context of a new-trial motion could be admissible where there is a showing of particularized guarantees of trustworthiness. There has been no proffer that, in fact, there were any or are any particularized guarantees of trustworthiness to this hearsay statement.  The alleged statement is not supported by affidavit or otherwise.  There [is] no showing of such guarantees and, thus, the statement itself would not be admissible as a prima facie claim.

> Deficient performance with regard to the failure to file a motion is not met here.

> The evidence, assuming the statement was admissible, would clearly be cumulative of the bias evidence presented through cross-examination of Paula Martinez.

(Ra 111, 21:12-22:17).

The Appellate Division affirmed denial of the PCR petition on this ground.  On appeal, petitioner faulted his trial attorneys for not discovering this information about Martinez receiving working papers until after trial.  The appellate court specifically noted:

> It was known at the time of trial that Martinez was an undocumented alien.  The judge noted that her potential bias was thoroughly undertaken.  The judge cited to specific portions of the October 15, 1997 trial transcript.  These excerpts deal with the issue of Martinez's deportation proceedings and the assistance of the Prosecutor's Office with respect to these proceedings.  The judge found that her "potential bias in favor of the State was adequately and thoroughly examined in the presence of the jury."
>
>  . . .  The judge found that the information would have been cumulative to the bias evidence presented through cross-examination of Martinez.

(Ra 12, at pp. 3-4).

This Court finds no deficient performance by trial counsel in this regard.  The import of the "new" information that Martinez was an illegal alien who had received working papers to remain in the United States was to show her bias or motive in testifying against petitioner at trial.  While the specific fact that Martinez had received her working papers was not discovered by trial counsel, Martinez' undocumented status was already known to counsel and he thoroughly cross-examined Martinez about the State's assistance in her deportation proceedings to emphasize a possible bias in her trial testimony against petitioner.  Any further attempt to bring this "new" information about the receipt

51

of working papers to the attention of the jury clearly would have been cumulative. Consequently, this "new" information was unlikely to change the outcome of the trial in any way, and petitioner cannot demonstrate the requisite prejudice in order to prevail on his claim that counsel was ineffective in failing to discover this information during trial.

Moreover, this Court finds that the state courts did not unreasonably apply established federal law in reaching their decisions. The state court decisions examined the <u>Strickland</u> two-part test, and found no deficient performance by trial counsel or prejudice from the alleged "failure" to discover this information about Martinez during trial. Thus, petitioner has not demonstrated that the state court decisions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified. <u>Matteo</u>, 171 F.3d at 891. Accordingly, this claim of ineffective assistance of counsel will also be denied for lack of substantive merit.

E. <u>Ineffective Assistance of Appellate Counsel</u>

Petitioner broadly asserts that his appellate counsel was ineffective in violation of his constitutional rights for his failure to raise on direct appeal the issues relating to trial counsel's ineffectiveness. It does not appear that this issue was raised initially in petitioner's state PCR proceedings. Rather, petitioner faulted his appellate counsel generally for

52

failing to present to the New Jersey Supreme Court all the issues presented on direct appellate review.  Petitioner also argued that his appellate counsel failed to present issues that would be barred on PCR review, but petitioner did not specify what these issues were.  Accordingly, the PCR court found that petitioner did not make a prima facie showing of ineffective assistance of appellate counsel and denied this claim in the state PCR proceedings.

On appeal from denial of the PCR petition, the Appellate Division noted that petitioner raised a claim that his "appellate counsel was ineffective in not requesting an appeal based upon the lack of forensic evidence and failure of trial counsels to effectively cross-examine the witness [Paula Martinez]".  The appellate court concluded that this claim, and petitioner's other claims, were "without merit" and did "not warrant discussion in a written opinion."  (Ra 12, at pg. 5).

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985).  Claims of ineffective assistance of appellate counsel are evaluated under the Strickland standard.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004); Wright v. Vaughn, 2004 WL 1687865, *6, n.10 (E.D. Pa. July 26, 2004).  Appellate counsel does not have a duty to

advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Moreover, in order to prevail on a claim that appellate counsel was ineffective, a petitioner must show not only that counsel's performance fell below an objective standard of reasonableness, but also that there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal. See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999), cert. dismissed, 527 U.S. 1050 (1999).

Based on review of the record, this Court finds that petitioner fails to establish deficient performance by appellate counsel. Claims asserting ineffective assistance of counsel, such as asserted by petitioner here, are not typically raised on direct appeal because it requires the appellate court to look beyond the bounds of the record and the evidence presented at trial. Moreover, petitioner fails to demonstrate how the alleged failure by appellate counsel to raise these claims on direct appeal would have had any reasonable potential for affecting the outcome of the appeal. Indeed, the claims were raised in the

state PCR proceedings and rejected out of hand, indicating that said claims would not have been successful even if they had been raised on direct appeal.  Therefore, this Court cannot conclude that the determination of this issue concerning appellate counsel by the state courts resulted in a decision that was contrary to, or involved an unreasonable application or determination of law or fact.  Williams v. Taylor, supra.  The ineffective assistance of appellate counsel claim will be denied accordingly.

### V.  CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  See Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition should be denied on the merits and a certificate of appealability will not issue.   An appropriate Order follows.


     /s/ Faith S. Hochberg
United States District Judge

DATED:  January 6, 2006

56